# EXHIBIT A

ARCHIE L. HAYMAN
P-37516

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>7th JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>16-106326-NO |
|---|---|---|

**Court address**
900 South Saginaw Street, Flint, MI 48502

Court telephone no.
(810) 424-4355

| Plaintiff's name(s), address(es), and telephone no(s).<br>LEEANNE WALTERS as next of friend of four minor children, G.W.1, G.W.2, J.D., and K.M. | v | Defendant's name(s), address(es), and telephone no(s).<br>LOCKWOOD, ANDREWS & NEWMAN, LOCKWOOD, ANDREWS & NEWMAN, PC, LOCKWOOD, ANDREWS & NEWMAN, INC., LEO A. DALY COMPANY, ROWE PROFESSIONAL SERVICES COMPANY f/k/a ROWE ENGINEERING, INC., VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Vinson F. Carter (P72659)<br>ROBINSON, CARTER, CRAWFORD, PLLC<br>400 N. Saginaw Street, Suite 237<br>Flint, MI 48502<br>810-496-1025 | | INC., BRADLEY WURFEL, EDEN VICTORIA WELLS, M.D., and HOWARD CROFT |

**SUMMONS** NOTICE TO THE DEFENDANT: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR2.111(C))
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued MAR 0 3 2016 | This summons expires JUN 2 2016 | Court clerk Tericia Albright |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in Genesee County Circuit _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no.<br>1413467CZ/16106077CZ/16106112CZ/16106150N | Judge<br>ARCHIE HAYMAN (x3); RICHARD B. YUILLE (x1) | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Flint, MI | Defendant(s) residence (include city, township, or village)<br>Multiple in Michigan including Flint, MI |
|---|---|
| Place where action arose or business conducted<br>Flint MI | |

Date 3/3/16

Signature of attorney/plaintiff Vinson Carter

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

**MC 01** (5/15) **SUMMONS AND COMPLAINT** MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

| PROOF OF SERVICE | SUMMONS AND COMPLAINT<br>Case No. |
|---|---|

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | **OR** | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:   (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:   (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,
together with _____
_____ List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare that the statements above are true to the best of my information, knowledge, and belief.

| Service fee<br>$ | Miles traveled | Mileage fee<br>$ | Total fee<br>$ |
|---|---|---|---|

Signature _____

Name (type or print) _____

Title _____

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                                        Date

My commission expires: _____ , Signature: _____
                                   Date                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                                              Attachments

_____ on _____
                                               Day, date, time

_____ on behalf of _____ .

Signature

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT OF THE COUNTY OF GENESEE**

LEE-ANNE WALTERS as next of friend and mother
of four minor children, G.W.1, G.W.2, J.D., KM,

      Plaintiffs,

v.

Hon. 16-106336-ND

Case No.

ARCHIE L. HAYMAN
P-37516

LOCKWOOD, ANDREWS & NEWMAN, P.C., a
Michigan Corporation, LOCKWOOD, ANDREWS &
NEWMAN, INC., a Texas Corporation, LEO A. DALY
COMPANY, a Nebraska Corporation, ROWE
PROFESSIONAL SERVICES COMPANY, f/k/a ROWE
ENGINEERING, INC.,VEOLIA NORTH AMERICA, LLC,
a Delaware Corporation, and VEOLIA NORTH AMERICA,
INC., a Delaware Corporation, BRADLEY WURFEL,
EDEN VICTORIA WELLS, M.D., and HOWARD CROFT,

      Defendants.

_____/

**ROBINSON, CARTER, CRAWFORD, PLLC**
Robert L. Robinson (P69688)
Vinson F. Carter (P72659)
Eva M. Crawford (P78832)
400 N. Saginaw Street, Suite 237
Flint, Michigan 48502
(810) 496-1025

**A TRUE COPY**
**Genesee County Clerk**

**LEVY KONIGSBERG, LLP**
800 Third Avenue, 11th Floor
New York, New York 10022
(212) 605-6200

_____/

There are four cases pending in this Court arising out of the same transaction or occurrences as
alleged in this complaint:

*Shears, et al. v. Bingaman, et al.*, 14-1-3467-CZ, assigned to the Hon. Archie Hayman;
*Collins, et al. v. Gov. Rick Snyder, et al.*, 16-106077-CZ, assigned to the Hon. Archie Hayman;
*Mays, et al. v. City of Flint, et al.*, 16-106112-CZ, assigned to the Hon. Archie Hayman; and
*Mason, et al. v. Lockwood, Andrews & Newman, PC*, 16-106150-NM assigned to the Hon.
Richard B. Yuille.

## COMPLAINT FOR DAMAGES

Plaintiff Lee-Anne Walters, as next of friend and mother of her four minor children, G.W.1, G.W.2, J.D. and K.M. (hereinafter "Plaintiff's children" or "Plaintiffs"), upon personal knowledge as to certain facts, upon information and belief as to other matters, and upon the investigation of her attorneys, brings this Complaint for Damages solely for the personal injuries suffered by her children:

## INTRODUCTION

1.    Plaintiff Lee-Anne Walters files this lawsuit because, as the result of corporate and government misconduct, her children were lead-poisoned and have suffered personal injuries. Plaintiff and her children had the basic right to clean water. They had the right to rely upon their government – and the corporate consultants and contractors of their government – to assure that the water flowing into their residence in Flint was safe in all respects – safe to drink, safe to bathe in, and safe to cook with. This lawsuit arises from the negligence, gross negligence, dereliction of duty, and lies that resulted in a public health crisis of historic proportions. The Flint Water Crisis, as it has now been called, is made up of thousands of individuals who have suffered. The most vulnerable of these individuals are children who drank water laced with lead. Plaintiff's children have suffered their own individual harm and their own individual damages. Only this individual lawsuit – and not a class action – is able to redress and fully compensate the individual harm suffered by Plaintiff's children. Plaintiff seeks her day in court for her children in this Court, here in Flint, where Plaintiff and her children have resided and suffered. Plaintiff seeks a jury comprised of Flint residents to render judgment against the corporate and government actors who hurt her children.

2

## PARTIES, JURISICTION AND VENUE

2.     Plaintiff Lee-Anne Walters and her four children have, at all relevant times, been residents of the City of Flint, and domiciled in the State of Michigan. Plaintiff's four children have been exposed to extremely high levels of lead due to Defendants' conduct, having bathed in and consumed lead contaminated water.

3.     As a result of Defendants' actions, Mrs. Walters' children have been lead poisoned and suffered injuries including, but not necessarily limited to brain and/or developmental injuries including (without limitation) cognitive deficits, hair, skin, digestive and other organ problems, physical pain and suffering, mental anguish, fright and shock, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification.

4.     Defendant Lockwood, Andrews & Newman, P.C. ("LAN PC") is a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint, Genesee County, Michigan 48532. At that location, LAN PC held itself out to the world as a Leo A. Daly Company ("LAD"). In 2008 LAN PC was incorporated by Lockwood Andrews & Newman, Inc. ("LAN INC."), after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County.

5.     Defendant LAN INC. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN INC. conducted business in Genesee County, Michigan through LAN PC. Per its website, LAN INC.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532.

6.     Defendant LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "[s]ervices are extended through [LAN INC.]."

7.     Defendants LAN PC, LAN INC. and LAD (collectively "LAN Defendants")

3

maintain an office in Flint, Genesee County, Michigan; regularly conduct business in Flint, Michigan; and have committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

8. Defendant Rowe Professional Service Company, f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan Corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

9. Defendant Rowe maintains an office in Flint, Genesee County, Michigan; regularly conducts business in Flint, Michigan; and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

10. Defendant Veolia North America, LLC is a Delaware corporation with its principal place of business in Indiana.

11. Defendant Veolia North America, Inc. is a Delaware corporation with its principal place of business in Indiana. For purposes of this pleading the Veolia entities will be collectively referred to as "Veolia" or "Veolia Defendants."

12. Defendant Veolia maintains an office in Westland, Wayne County, Michigan; transacts business in the State of Michigan – including the business it performed for the City of Flint in 2015; and has committed torts in the State of Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

13. Defendant Bradley Wurfel ("Wurfel") was at all relevant times herein an agent and employee of the State of Michigan, employed by the MDEQ as Director of Communications, and was acting within the course and scope of his respective employment and/or authority when he committed the tortious misconduct alleged in this Complaint.

14. Defendant Eden Victoria Wells, M.D. ("Wells") was at all relevant times herein

4

an agent and employee of the State of Michigan employed by the Michigan Department of Health and Human Services ("MDHHS") as Chief Medical Executive within Population Health and Community Services, and was acting within the course and scope of her respective employment and/or authority when she committed the tortious misconduct alleged herein.

15.     Defendant Howard Croft ("Croft") was at all relevant times herein Director of Public Works for the City of Flint ("Flint"), and was acting within the scope of his employment and/or authority when he committed the tortious misconduct alleged in this Complaint.

16.     This court has subject matter jurisdiction over the claims asserted in this lawsuit because Plaintiffs seek compensation in an amount in excess of $25,000.

17.     This Court has jurisdiction over the corporate Defendants pursuant to MCL 600.705.

18.     This Court has personal jurisdiction over each of the individual Defendants because the wrongful conduct of each as alleged in this lawsuit occurred in the State of Michigan, County of Genesee, City of Flint.

19.     Venue is proper in this Court because the original injury and damage occurred in Genesee County, Defendants reside or conduct business in Genesee County, Plaintiffs reside in Genesee County and many of the occurrences described herein occurred in Genesee County.

## STATEMENT OF FACTS

20.     This case arises from the tragic and preventable poisoning of the City of Flint.

21.     Defendants' outrageous actions have caused irreparable harm to Plaintiff's children.  Their collective failure to enforce safe drinking water standards, and deliberately hiding the effects of their egregious misconduct, caused Flint to suffer a historic catastrophe.

22.     Six private companies substantially contributed to this disaster in negligently

undertaking a duty to provide services associated with Flint's water system, resulting in the poisoning of thousands, including Plaintiff's children.

23.     The actions of those state and city employees sued in their individual capacities, in failing to protect Flint residents and then obscuring their horrific misconduct as Plaintiff's children suffered, constitutes gross negligence, conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results, for which they are not afforded immunity.

24.     As a direct and proximate result of Defendants' actions and/or failures to act, Plaintiff's children have been lead poisoned and have suffered serious physical, mental, and emotional injury, as described herein.

### *Flint Michigan's Water Supply Prior to 2014*

25.     In 1964, Flint officials signed a 30-year contract to buy treated Lake Huron water from Detroit.  Under that deal, Flint would pay almost $10 million for Detroit to help build an extension to the pipeline that would allow Detroit to deliver the lake water to the city (more than $74 million when adjusted for inflation).  Flint would also pay Detroit for the water itself, an expense that had grown to $9.6 million in 2013.  That arrangement remained in place for almost half a century.

### *The State of Michigan's "Emergency Manager" System*

26.     Since 1988, the State of Michigan has had some form of emergency management law for municipal financial crises.

27.     Enacted in 2012, Public Act ("PA") 436 provides local governments with a "choice" as to whether an Emergency Manager will be appointed.

28.     The local government may "choose" between a consent agreement, chapter 9

6

bankruptcy, mediation, or an Emergency Manager with similar broad powers to the prior statute's Emergency Manager.

29. PA 436 often forces Emergency Managers on municipalities under the illusion of the municipality's own determination.

30. Ironically, the stated purpose of PA 436 is to "preserve the capacity of local units of government ... to provide or cause to be provided necessary services essential to public health, safety, and welfare[.]"

31. The Emergency Manager's mandate is to "assure ... the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." MCL 141.1549(2).

32. Michael Brown ("Brown") served Governor Snyder as Flint's Emergency Manager until August 2012; Ed Kurtz ("Kurtz") served as Flint's Emergency Manager from August 2012 until July 2013; Brown again served as Flint's Emergency Manager from July 2013 until October 2013; Darnell Earley ("Earley") served as Flint's Emergency Manager from October 2013 until January 2015; and Gerald Ambrose ("Ambrose") served as Flint's Emergency Manager from January 2015 until April 2015.

### The MDEQ has Historically Failed to Protect against Lead Contaminated Water

33. In 2010, the Environmental Protection Agency ("EPA") commissioned a report that indicated problems with the ability of the Michigan Department of Environmental Quality ("MDEQ") to ensure safe drinking water. The report noted that funding cuts caused important MDEQ drinking water positions to be filled "with staff from other programs that have been cut or eliminated ... While this practice preserves jobs, it decreases the technical knowledge of staff[.]" It flatly stated that "[t]raining for new staff would also be appreciated on fundamental

7

public health issues and compliance decisions." The report also indicated a number of technical shortcomings in the way the MDEQ regulated the state's drinking water, particularly as it related to lead contamination.

34.     Specifically, the report noted that while federal regulations require water utilities to certify that the drinking water of 90% of homes in a given community contain no more than 15 parts per billion ("ppb") of lead, MDEQ had a practice of not even calculating "90th percentiles" unless a potential exceedance had been identified. This "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated."

35.     The report also noted that MDEQ did not conduct the required number of water samples for lead, apparently in an effort to conserve agency resources.

### *Flint's Water Supply is Switched to the Flint River without the Provision of Corrosion Control, Causing Poisonous Lead from Thousands of Pipes into Plaintiffs' Drinking Water*

36.     For decades prior to April 25, 2014, the City of Flint received safe, clean, treated drinking water from the Detroit Water and Sewer Department ("DWSD").

37.     In November of 2012, Emergency Manager Kurtz wrote to Treasurer Andy Dillon suggesting that Flint join the (yet to be formed) Karegnondi Water Authority ("KWA") due to cost savings over DWSD. In April, 2013, Dillon gave Kurtz permission to notify the DWSD that it would be terminating service and switching to the KWA in the coming years.

38.     On April 16, 2013, Kurtz ordered that Flint switch its long-term water supplier from the DWSD to the KWA, which depended on a then unbuilt infrastructure. In the interim, Flint was to switch to the Flint River as a source for the City's water.

39.     The Flint River was studied for use as a primary water source in July 2011.

40.     Defendant Rowe completed a report on behalf of the city of Flint titled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint." It stated that treating Flint

8

River water on a continuous basis would be a challenge and more expensive than treating lake water. The study concluded it could be done if improvements were made to Flint's water treatment plant.

41.     At that time, based on Defendant Rowe's 2011 report, the River was rejected as a source because of the comparatively high costs of preparing Flint's water treatment plant to treat Flint River water to applicable standards.

42.     On November 7, 2013 Defendant Rowe was re-hired by Flint for professional services for the 2014 fiscal year, wherein Defendant Rowe would serve as Acting City Engineer.

43.     On March 7, 2014, DWSD was told: "[t]he Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination ... there will be no need to ... purchas[e] water to serve [Flint] after April 17, 2014."

44.     Between April 16, 2014 and April 25, 2014, numerous state and city employees expressed discomfort with the switch. One wrote that he was "expecting changes to our Water Quality Monitoring parameters, and ... our lead & copper monitoring plan[1] ... Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible." Another employee stated that he would "need time to adequately train ... staff ... update our monitoring plans before [the transition].

45.     On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made. The same day, then-current Flint Mayor Dayne Walling publically declared "It's regular, good, pure drinking water, and it's right in our backyard."

---

[1] The EPA's Lead and Copper Rule ("LCR") has been enacted to establish protocols to ensure that public water systems do not allow unsafe levels of lead or copper to contaminate their water supply.

9

46.     Defendant Croft stated in a press release that "[t]he test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect. We are proud of that end result." Defendant Croft's statement was made despite knowledge of concerns regarding the facility's inadequate preparation and monitoring.

47.     The LAN Defendants were hired to prepare Flint's water treatment plant for the treatment of new water sources, including both the KWA and the Flint River.

48.     Flint's water treatment plant had not needed to treat the water received from DWSD, as DWSD provided that water in an already treated state.

49.     The LAN Defendants were responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources. They failed miserably in this task. Their actions facilitated the transfer of Flint's water source to river water without the proper treatment, which was necessary to protect against the poisoning of thousands of Flint residents, including Plaintiff's children.

50.     According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives.

51.     LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents. Further, LAN did not require corrosion control to ensure that corrosive water was not delivered throughout Flint's aging water system.

52.     During this time, Defendant Rowe, which in 2011 articulated the need for treatment to the Flint River water and for improvements to Flint's water treatment plant if the

river was used as a source, was serving Flint as Acting City Engineer.

53.    The MDEQ, as Flint's "primacy agency," and Defendants LAN and Rowe were responsible for ensuring that Flint set water quality standards and properly treated its water.

54.    LAN, as Flint's outside contractor, and Rowe as the Acting City Engineer had a duty to recognize the need for corrosion control and advise that it should be implemented.

55.    Defendant Rowe had a duty to ensure that the standards it articulated in 2011 were being adhered to by LAN and the MDEQ.

56.    The Flint River water was known to Defendants to contain about 8 times more chloride than Detroit water. Thus, the water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD. Further, is well known to trained professionals that corrosive water not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.

57.    At the time of the switch to Flint River water, nothing whatsoever was being done to account for the corrosive nature of the Flint River water.

58.    It is important that a new water source be properly studied and treated to ensure that its use will not result in pipe corrosion in the delivery system. This is particularly important where portions of the delivery system, including service lines, are made of lead. An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead.

59.    Lead is a neurotoxin that can have devastating impacts on the development of children. There is no safe level of lead. Its effects are harmful even at low levels.

60.    Lead exposure in children causes heightened levels of lead in the blood and body, resulting in decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems, and psychological disorders.

61.     Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system.

62.     The use of corrosive water, such as the untreated Flint River water, causes corrosion of iron water pipes, which should be obvious to trained professionals and those tasked with providing safe drinking water, when it occurs.

63.     The corrosion of iron pipes can result in increased water main leaks and breaks.

64.     Additionally, signs of iron corrosion are a warning that lead corrosion is also present, since both are caused by the same phenomenon.

65.     As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System, which predictably corroded metal pipes, causing metals, including lead, to leach into water.

66.     Almost immediately after the water source was changed to the Flint River, many residents began to complain about odorous, discolored water.

67.     In August and September, 2014, the City of Flint issued two boil water advisories after fecal coliform bacteria were discovered in the water.

68.     Per the Centers for Disease Control ("CDC"), heating or boiling water will not remove lead. In fact, because some of the water evaporates during the boiling process, the lead concentration of the water can actually increase slightly as the water is boiled.

69.     On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

70.     The LAN Defendants issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations. The LAN entirely failed to address the hazard of lead associated with the corrosive

water flowing through the pipes, at least half of which were made of lead.

71.    On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water. It was claimed that the water was safe to drink for most people with healthy immune systems.

72.    On January 9, 2015, the University of Michigan – Flint discovered lead in campus drinking fountains.

73.    On January 12, 2015, DWSD offered to waive a 4 million dollar reconnection fee to transition back to DWSD water. The offer was declined.

74.    As early as January 2015, state offices in Flint were provided purified water coolers in response to concerns about the drinking water, while government employees continued to tell the public that the water was safe to drink.

75.    On January 21, 2015, enraged Flint residents, including Mrs. Walters, attended a meeting at Flint City hall, bringing jugs of discolored water and complaining about the water.

76.    At the meeting, Mrs. Walters showed samples of water from her home that were clearly discolored, to Ambrose, who stated she was a "liar if [she] was trying to tell people that this was [her] water."

77.    Between January 29, 2015 and February 6, 2015 internal documents show an awareness of serious issues with the water. One employee at the MDEQ stated in response to residents' complaints, "[W]hat they are seeing is a result of differing water chemistry … [which] can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system … Since it appears wide-spread, it's most likely a distribution system problem."

78.    In February 2015, Mrs. Walters filmed one of her sons, to show doctors how his skin was reacting after baths. "He gets in the tub and there's a water line across his stomach from the waist down," she said, describing the video. "He's breaking out in this nasty, scaly, burning, itchy rash, and if you put lotion on it, it burns him. He would scream because it hurt."

79.    The video convinced the child's doctor to write a note, which persuaded the city to test Mrs. Walters' water. Weeks later, an official left a message on Mrs. Walters' voicemail, which stated: "Please don't let your kids drink this water. Do not mix their juice with this water. We need to talk to you."

80.    The test had uncovered that Walters' water was contaminated with lead showing lead levels measuring 107 parts per billion (ppb) – more than seven times the federal government's "action level" threshold. A second test came back even higher, at 397 ppb.

81.    Initially, city officials tried to brush Mrs. Walters' case off as an anomaly and offered to replace her service lines. They also offered to waive her water bill and suggested sending her children to a dermatologist.

82.    By this time Mrs. Walters had become so disgruntled that she personally reached out to the EPA, eventually reaching a water specialist named Miguel Del Toral.

83.    Mrs. Walters' personal research had turned up a reference to "orthophosphate," a chemical commonly used to treat drinking water, which she mentioned to Del Toral. Mrs. Walters had begun inspecting the city's monthly operation reports, which detailed the chemicals Flint was adding to the water.

84.    On February 27, 2015 an MDEQ employee told the EPA that the Flint Water Treatment Plant had an optimized corrosion control program, despite the fact that it did not.

85.    The MDEQ, the LAN Defendants and Defendant Rowe in fact knew that no

14

optimized corrosion control had been implemented, because none of them required it, and they did not set water quality parameters for the Flint River source water.

86.     The effect of this inexplicable failure was the exposure of thousands of Flint residents, including vulnerable children, including Plaintiff's children, to poisonous water that caused lead poisoning and a wide variety of health effects, including cognitive and developmental problems.

87.     On February 27, 2015, Del Toral began to voice concerns about the likely cause of the high lead levels detected in Flint. He attributed those levels to particulate lead, which would mean that the MDEQ's and the LAN Defendants' testing methods of "pre-flushing" water from homes would bias samples low. He also inquired about optimized corrosion control, which he noted was required in this instance.

88.     Around this time internal government emails refer to Flint's water crisis as consisting of "hiccups," and discount the possibility of imminent threats to the public. It was claimed in one email that "once the city connects to the new KWA system in 2016, this issue will fade into the rearview."

89.     During this time officials refused to consider reconnecting to DWSD because of the cost.

90.     All the while, neither the LAN Defendants nor Defendant Rowe did anything to address what they knew or should have known was a catastrophic public health crisis.

91.     In early 2015, Defendant Veolia was hired to conduct a review of the city's water quality, largely in response to citizen complaints. Veolia declared the water safe while the water poisoned tens of thousands, including Plaintiff's children.

92.     Defendant Veolia's task was to review Flint's public water system, including

15

treatment processes, maintenance procedures, and actions taken.

93.    As water treatment professionals, Defendant Veolia had an opportunity to catch what the LAN Defendants and Defendant Rowe had missed or refused to warn about – that corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

94.    On February 12, 2015, Rob Nicholas, Defendant Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

95.    Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Defendant Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. In the interim report, Defendant Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." Defendant Veolia effectively declared publically that Flint's poisonous water was safe.

96.    Defendant Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among Defendant Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

97.    In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water. "

16

98.     Defendant Veolia issued its final "Water Quality Report" on March 12, 2015.

99.     In the final report, Defendant Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

100.    The final report also states that "the public has ... expressed its frustration of discolored ... water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

101.    Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

102.    Therefore, in addition to completely missing the connection between the lack of corrosion control and lead contamination, Defendant Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

17

103. In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

104. As a result of Defendant Veolia's actions, Flint residents, including Plaintiff's children, continued to be exposed to poisonous water beyond February and March of 2015.

105. As evidence of problems mounted, the state and the MDEQ, in harmony with Rowe, LAN and Veolia, denied the dangers facing residents, insisting the water was safe.

106. On March 24, 2015, Ambrose publically declared that "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality ... water from Detroit is no safer than water from Flint."

107. No later than April of 2015, Del Toral stated that the sampling procedures being utilized by Defendants skewed lead level results and did not properly account for the presence of lead service lines. Del Toral issued a memorandum, stating: "I wanted to follow up on this because Flint has essentially not been using any corrosion control treatment since April 30, 2014, and they have (lead service lines). Given the very high lead levels found at one home and the pre-flushing happening in Flint, I'm worried that the whole town may have much higher lead levels than the compliance results indicated, since they are using pre-flushing ahead of their compliance sampling."

108. Del Toral, a national expert in the field, identified the problem, the cause of that problem, and the specific reason it had been missed.

109. On April 24, 2015, the EPA was finally informed that Flint did not have optimized corrosion control in place, contradicting what had previously been stated.

110. Around this time, Mrs. Walters reached out to a civil engineering Professor at

18

Virginia Tech, Marc Edwards, who gained prominence after helping uncover lead contamination in Washington, D.C., in 2004. Edwards agreed to help her.

111.    In testing Mrs. Walters' water, Edwards found an average of 2500 ppb, with a high sample of 13,500 ppb.

112.    On June 24, 2015, Del Toral authored an alarming memorandum more fully stating his concerns about the problems with oversight of Flint. The memorandum noted that the lack of corrosion control for mitigating lead and copper levels, was "[a] major concern from a public health standpoint." Further, "[r]ecent drinking water sample results indicate the presence of high lead results ... which is to be expected in a public water system that is not providing corrosion control treatment. The lack of any mitigating treatment for lead is of serious concern for residents that live in homes with lead service lines or partial lead service lines, which are common throughout the City of Flint."

113.    Additionally, "[t]he lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in ... compliance samples due to the sampling procedures used ... for collecting compliance samples ... This is a serious concern as the compliance sampling results which are reported ... to residents could provide a false sense of security ... regarding lead levels in their water and may result in residents not taking necessary precautions to protect their families[.]"

114.    Del Toral's memorandum also noted that Mrs. Walters had alarming results of 104 ug/L and 397 ug/L, which was especially worrisome given the MDEQ's flawed sampling procedures. The MDEQ had told Mrs. Walters that the lead was coming from the plumbing in her own home, but Del Toral's inspection revealed that her plumbing was entirely plastic.

115.    The memorandum also noted blood tests showed that Plaintiff's children had

19

elevated blood lead levels, and the additional sample results from resident-requested samples showed high levels of lead.

116.    On July 9, ACLU-Michigan reporter Curt Guyette publically broke the story about lead in Flint's drinking water, citing Del Toral's memorandum and exposing the lack of corrosion control in Flint's water.

117.    Four days later, Defendant Wurfel issued the following public statement: "Let me start here – anyone who is concerned about lead in the drinking water in Flint can relax."

118.    In mid-July, 2015, an internal government email was generated attempting to discredit Del Toral, to this point the only government employee actively trying to protect Flint's residents from lead poisoning. The email claimed "[r]egarding the EPA drinking water official quoted in the press articles, the report that he issued was a result of his own research and was not reviewed or approved by EPA management. He has essentially acted outside his authority."

119.    On July 21, 2015, in a conference call initiated by the EPA, the EPA pushed for optimized corrosion control (which it had previously been told Flint was using).

120.    On July 24, 2015, Defendant Wurfel sent an email, stating: "[T]he Flint Ministers met with the Governor's office again last week. They also brought along some folks from the community – a college prof and GM engineer – who imparted that 80 water tests in Flint have shown high lead levels. Could use an update on the January/June testing results, as well as recap of the December testing numbers, and any overview you can offer to edify this conversation."

121.    That same day it became known to Defendants that their second round of Flint drinking water testing showed a 90th percentile level of 11 parts per billion, almost double the prior round's results.

122.    On July 24, 2015, Defendant Wurfel wrote the following to various officials:

20

"[H]ere's an update and some clarification on the lead situation in Flint. Please limit this information to internal for now ... By the tenants of the federal statute, the city is in compliance for lead and copper. That aside, they have not optimized their water treatment ... Conceivably, by the time we're halfway through the first timeline, the city will begin using a new water source with KWA ... and conceivably, the whole process starts all over again. In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an eminent health threat from lead or copper."

123.    A July 28, 2015 email from an MDHHS employee identified an increase in blood lead levels in Flint just after the switch to river water, and concludes only that the issue "warrant[s] further investigation."

124.    MDHHS took no action however, as outsiders began to discover and reveal Flint's lead problem.

125.    In August, 2015, the EPA pressed Defendants to move faster on implementing corrosion control in Flint.

126.    On August 4, 2015, Mrs. Walters met with Defendant Wurfel, among others, who acknowledged that the results from the testing done by Defendants at her home had been thrown out. Mrs. Walters later discovered that had the results been produced by Defendants to the EPA that Defendants would have been found to be in violation of the LCR.

127.    On August 23, 2015, Edwards wrote the MDEQ to inform them that he would be conducting a study of Flint's water quality.

128.    The LAN Defendants issued their second Operational Evaluation Report, which was 40 pages, on August 27, 2015, intended again to address compliance with EPA and MDEQ

operations and regulations.  Once again, the LAN Defendants neglected to address the hazards of lead in the Flint Water which was poisoning residents of Flint, including Plaintiff's children.

129.    Ironically, on August 27, 2015, Edwards's preliminary analysis was released. More than half of the first 48 samples tested came back above 5 ppb, and more than 30% came back over 15ppb, which was unacceptable even as a 90th percentile.  He called the results "worrisome."

130.    In an e-mail response to a Governor's office inquiry regarding the high lead levels in residents' homes and the discrepancy between those numbers and the state's test results, Defendant Wurfel stated "[d]on't know what it is, but I know what it's not.  The key to lead and copper in drinking water is that it's not the source water, or even the transmission lines (most of which are cast iron).  It's in the premise plumbing (people's homes)."

131.    This statement was made despite the fact that about half of Flint's homes are connected to lead service lines, and that it was clear by this point that Mrs. Walters's home had plastic plumbing.

132.    Defendant Wurfel then blamed Del Toral, the ACLU, and others taking action to help Flint's residents, stating: "This person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals ... [I]t's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed."

133.    On September 2, 2015, Defendant Wurfel engaged in further efforts to discredit Marc Edwards, this time in a press release. He stated: "[W]e want to be very clear that the lead levels being detected in Flint drinking water are not coming from the treatment plant or the city's

22

transmission lines ... The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes ... the results reported so far fail to track with any of the lead sampling conducted by the city. In addition, Virginia Tech results are not reflected by the blood lead level testing regularly conducted by the state department of community health that have not shown any change since Flint switched sources."

134.  Defendant Wurfel knew this statement to be false. For example, it was obvious by this point that Mrs. Walters's home had plastic plumbing.

135.  On September 6, 2015, another Defendant Wurfel attempt to discredit Edwards's results was published through Michigan Public Radio: "The samples don't match the testing that we've been doing in the same kind of neighborhoods all over the city for the past year. With these kinds of numbers, we would have expected to be seeing a spike somewhere else in the other lead monitoring that goes on in the community."

136.  Edwards published a report in early September, 2015, with startling findings. Among them: "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM;" "101 out of 252 water samples from Flint homes had first draw lead more than 5 ppb;" "Flint's 90th percentile lead value is 25 parts per billion ... over the EPA allowed level of 15 ppb that is applied to high risk homes ... how is it possible that Flint 'passed' the official EPA Lead and Copper Rule sampling overseen by MDEQ?" "Several samples exceeded 100 ppb and one sample collected after 45 seconds of flushing exceeded 1000 ppb[.]"

137.  Additional Edwards findings included that "[o]n average, Detroit water is 19 times less corrosive than the Flint River water currently in use;" "even with phosphate, Flint River water has 16 times more lead compared to the same condition using Detroit water."

138.  Therefore, the Flint River water was so corrosive that even the obvious, necessary

measure of adding corrosion control may not have been enough to make it totally safe.

139.   This would have been known if the water was treated or studied before the switch.

140.   Edwards predicted that "in the weeks and months ahead MDEQ and Flint will be forced to admit they failed to protect public health as required under the Federal Lead and Copper Rule." He was entirely correct.

141.   Another Defendant Wurfel attack on Professor Edwards and his team occurred on September 9, 2015, when he told a reporter: "[T]he state DEQ is just as perplexed by Edwards's results as he seems to be by the city's test results, which are done according to state and federal sampling guidelines and analyzed by certified labs." This statement was made with full knowledge that Del Toral had told Defendants their testing was not being conducted according to federal guidelines.

142.   Defendant Wurfel also claimed that Edwards' team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

143.   Again, Defendant Wurfel publically attempted to discredit the people working to protect the public, while providing false assurances to Flint's residents about the water that continued to poison them.

144.   On September 10, 2015, Dr. Yanna Lambrinidou, a member of the EPA National Drinking Water Advisory Council Lead and Copper Rule workgroup wrote to Defendant Wurfel, requesting information on "optimal water quality parameter ranges." No such information existed, because none of the Defendants created it.

145.   On September 15, 2015, MLive published an article entitled "Virginia Tech

24

professor says Flint's tests for lead in water can't be trusted." Edwards is quoted as recommending a return to DWSD, stating "Flint is the only city in America that I'm aware of that does not have a corrosion control plan in place to stop this kind of problem."

146. On September 23, 2015, an e-mail from Defendant Croft to numerous officials included the following: "I am pleased to report that the City of Flint has officially returned to compliance with the Michigan Safe Drinking Water Act and we have received confirming documentation from the DEQ today ... Recent testing has raised questions regarding the amount of lead that is being found in the water and I wanted to report to you our current status. At the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the DEQ. It was determined that having more data was advisable prior to the commitment of a specific optimization method. Most chemicals used in this process are phosphate based and phosphate can be a 'food' for bacteria. We have performed over one hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."

147. Defendant Croft's statement was made despite his knowledge that the samples the city had taken were insufficient to draw any conclusions and made no mention of the flawed lead testing results.

148. The MDHHS extended the same treatment to Dr. Mona Hanna-Attisha, a prominent local pediatrician who runs the pediatric residency program at the Hurley Children's Hospital, as was extended by Defendants to Del Toral and Edwards.

149. The Walters family's ordeal was especially troubling to Dr. Hanna-Attisha. "When pediatricians hear about lead anywhere, we freak out," she told her hometown newspaper, The Oakland Press.

25

150.   Dr. Hanna-Attisha decided to run an analysis of her own. Using the hospital's patient records, she studied test results from more than 3,000 children in and around Flint. The findings, later published in the American Journal of Public Health, were shocking.

151.   Dr. Hanna-Attisha discovered that, in Flint, the share of patients, 5-years-old and younger, with elevated levels of lead in their blood had nearly doubled – from 2.1 percent to 4 percent – since the city started sourcing its water from the river.

152.   In some neighborhoods, she found, the number of children with high lead levels had tripled.

153.   Throughout September, 2015, Dr. Mona Hanna-Attisha requested from MDHHS full state records on blood tests, to compare to her own data. She notes "[s]ince we have been unable to obtain recent MCIR blood lead data for Flint kids in response to the lead in water concerns, we looked at all the blood lead levels that were processed through Hurley Medical Center[.]" She states that despite being denied data from the state, she found "striking results."

154.   Dr. Hanna-Attisha heard complaints from Flint residents about their water and found out that no corrosion control was used. She developed a study using her hospital's data, comparing lead levels in blood samples taken before and after the switch in the water supply.

155.   On September 24, 2015, Dr. Hanna-Attisha released a study showing post-water-transition elevated blood-lead levels in Flint children at a press conference. Dr. Hanna-Attisha had done the job that the MDHHS should have done.

156.   Earlier that day, the MDHSS circulated a memorandum of "Flint Talking Points" in anticipation of Dr. Hanna-Attisha's study. It noted that her results were "under review" by MDHHS, but that her methodology was different, implying that her methodology was unorthodox or improper. "Looking at the past five years as a whole provides a much more

26

accurate look at the season trends of lead in the area," MDHHS claimed. "MDHHS data provides a much more robust picture of the entire blood lead levels for the Flint area."

157. It never addressed the most important question – what if Dr. Hanna-Attisha was right?

158. As this was going on, Professor Edwards forcefully requested blood lead data as well. In one email, the Professor notes that the state had failed to provide the records to Dr. Hanna-Attisha's team, and accused Defendants of "raising ... obstacles to sharing it with everyone who asks."

159. On September 25, 2015, the City of Flint issues a health advisory, telling residents to flush pipes and install filters to prevent lead poisoning.

160. That same day, a reporter from The Free Press, Kristi Tanner, sent an email to the MDHHS saying she had looked at the lead increase in Flint as shown in DHS records between 2013-2014 and 2014-2015 and concluded that the increase was "statistically significant."

161. On September 28, 2015, another incredible Defendant Wurfel public statement was released. He claims that the Flint situation is turning into "near hysteria," and says of Dr. Hanna-Attisha's statements: "I wouldn't call them irresponsible. I would call them unfortunate." He again declares Flint's water safe.

162. Incredibly, and in blatant violation of state law, at all relevant times the state's "top doctor," MDHHS chief medical executive Defendant Wells was attending to her responsibilities part time while also working at the University of Michigan. Defendant Wells did not become a full time state employee until February 1, 2016, and her mandatory responsibilities at the state prior to that time may have involved as little as eight (8) hours per week.

163. Defendant Wells was the sole medical doctor working as an executive for the

27

department.

164.    The Governor's Executive Director sent an e-mail on September 29, 2015, soliciting information for a meeting regarding emergency management and noting that Dr. Wells "should be speaking with Hurley."

165.    A September 29, 2015, internal e-mail between MDHHS employees refers to the situation in Flint as sounding "like a third world country" and openly wondering when the federal government might be able to step in.

166.    On September 29, 2015, an MDHHS email to Defendant Wells states: "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases."

167.    Defendant Wells' only reply to that email was a single word: "Agree," showing the MDHHS continuing efforts to mislead the public and discredit Dr. Hanna-Attisha.

168.    When Dr. Hanna-Attisha directly e-mailed Defendant Wells with updated findings that isolated certain high-risk areas of the city and showed that blood lead levels have "more than tripled," Defendant Wells responded that the state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public.

169.    While discouraging her department to look further into Dr. Hanna-Attisha's findings and misleading Dr. Hanna-Attisha, Defendant Wells remained focused on a single task; saving face at the expense of Flint's residents.

170.    Also on September 29, 2015, Genesee County issued its own health advisory about Flint's water. Two days later, the county warned Flint residents not to drink the water.

171.    On October 1, 2015, the MDHHS officially confirmed Dr. Hanna-Attisha's results. Department employees developed a "talking points" memorandum that gently admitted

that further analysis of their own data supported the doctor's findings, but cited lead paint as a greater concern than the water.

172. Finally, after months of denial, obstruction, and lies, Defendants began to act on or about October 1, 2015. Water filters were distributed to residents. But subsequent tests showed that lead levels in Flint's water were so high that filters could not remove all lead, meaning the state's recommendation and distribution of filters continued to inflict harm.

173. On October 16, 2015, Flint reconnected to DWSD. However, the damage had been done and lead has continued to leach from pipes into the water.

174. On December 5, 2015, the City of Flint declared a state of emergency.

175. On December 23, 2015, the Michigan Auditor General provided an investigative report on the crisis, finding that corrosion control should have been maintained from the beginning and that improper sample sites had been selected.

176. On December 29, 2015, a task force appointed by the Governor issued a letter detailing its findings, which states in part: "The City of Flint's water customers – fellow Michigan citizens – were needlessly and tragically exposed to toxic levels of lead through their drinking water supply."

177. On December 30, 2015, Defendant Wurfel resigned.

178. On January 4, 2016, Genesee County declared its own state of emergency.

179. On January 12, 2016, the Governor called the National Guard into Flint and requested assistance from FEMA.

180. On January 16, 2016, President Barack Obama declared a federal state of emergency in Flint.

181. On January 21, 2016, the EPA issued an Emergency Order, based on its finding

29

that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue."

182.    The Emergency Order notes that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014.    The river's water was corrosive and removed protective coatings in the system.    This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

183.    The Emergency Order indicates that "water provided by the City to residents poses an imminent and substantial endangerment to the health of those persons … by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

184.    On February 16, 2016, the state hired Defendant Rowe, which had already failed miserably as Acting City Engineer to begin the process of locating, removing, and eventually replacing lead pipes in the highest risk areas of Flint.

## COUNT I – PROFESSIONAL NEGLIGENCE
### LAN Defendants

185.    Plaintiffs incorporate by reference all preceding allegations set forth above as fully stated herein.

186.    The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

187.    The LAN Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

188.    Based on their undertaking, the LAN Defendants had a duty to Plaintiffs to exercise reasonable care.

189.    Plaintiffs relied on the City, State, and/or the LAN Defendants to perform the

duty to ensure the proper treatment of the new water source(s).

190. The LAN Defendants failed to exercise reasonable care in preparing for and executing the transition from treated DWSD water to untreated Flint River water.

191. The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

192. The LAN Defendants failed to exercise reasonable care when they did not implement corrosion control in a system containing lead pipes that was being transitioned onto a highly corrosive water source.

193. The LAN Defendants failed to exercise reasonable care when they failed to recognize the need for corrosion control in a system containing lead pipes when the LAN Defendants continued to undertake duties to provide professional engineering services in relation the Flint Water System on an ongoing basis.

194. Plaintiffs suffered harm resulting from the LAN Defendants' failures to exercise reasonable care.

195. The LAN Defendants' failure to exercise reasonable care caused the Plaintiffs' injuries, which were entirely foreseeable.

196. The LAN Defendants are liable to Plaintiffs for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

197. The LAN Defendants' liability includes, without limitation, lead poisoning, personal injuries, illnesses, and exposure to lead and other toxic substances suffered by Plaintiffs as a result of the LAN Defendants' failures to exercise reasonable care.

198. The LAN Defendants' conduct and/or failure(s) to act constitute gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether

31

an injury would result.

199.    The LAN Defendants' actions and/or omissions were a proximate cause of the Plaintiffs' injuries. As a direct and proximate result, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity, as well as punitive and/or exemplary damages.

## COUNT II – PROFESSIONAL NEGLIGENCE
### Defendant Rowe

200.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

201.    Defendant Rowe undertook, for consideration, to render services for the City of Flint, which it should have recognized as necessary for the protection of Plaintiffs.

202.    Defendant Rowe undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

203.    Based on its undertaking, Defendant Rowe had a duty to Plaintiffs to exercise reasonable care.

204.    Plaintiffs relied on the City, State, and/or Defendant Rowe to perform duties of Acting City Engineer, part of which was to ensure proper treatment of the new water source(s).

205.    Defendant Rowe failed to exercise reasonable care in overseeing the preparation for and execution of the transition from treated DWSD water to untreated Flint River water.

206.    Defendant Rowe failed to undertake reasonable care and conduct as a professional

32

engineering firm.

207.    Defendant Rowe failed to exercise reasonable care when it did not insist on the implementation of corrosion control in a system containing lead pipes that was being transitioned onto a highly corrosive water source.

208.    Plaintiffs suffered harm resulting from the Defendant Rowe's failures to exercise reasonable care.

209.    Defendant Rowe's failure to exercise reasonable care caused the Plaintiffs' injuries, which were entirely foreseeable.

210.    Defendant Rowe is liable to Plaintiffs for all harms resulting to them from Defendant Rowe's failures to exercise reasonable care.

211.    Defendant Rowe's liability includes, without limitation, lead poisoning, personal injuries, illnesses, and exposure to lead and other toxic substances suffered by Plaintiffs as a result of Defendant Rowe's failures to exercise reasonable care.

212.    Defendant Rowe's conduct and/or failure(s) to act constitute gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

213.    Defendant Rowe's actions and/or omissions were a proximate cause of the Plaintiffs' injuries. As a direct and proximate result, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning

33

capacity, as well as punitive and/or exemplary damages.

## COUNT III – PROFESSIONAL NEGLIGENCE
### Veolia Defendants

214.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

215.    Defendant Veolia undertook, for consideration, to render services for the City of Flint, which it should have recognized as necessary for the protection of Plaintiffs.

216.    Defendant Veolia undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

217.    Based on its undertaking, Defendant Veolia had a duty to Plaintiffs to exercise reasonable care.

218.    Plaintiffs relied on the City, State and/or Defendant Veolia to perform the duty to inspect the City's water supply to make sure that it was safe.

219.    Defendant Veolia failed to undertake reasonable care and conduct as a professional engineering firm.

220.    Defendant Veolia failed to exercise reasonable care in inspecting the city's water system and issuing its interim and final reports.

221.    Defendant Veolia failed to exercise reasonable care when it declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

222.    Defendant Veolia failed to exercise reasonable care when it represented that Flint's drinking water was safe.

223.    Defendant Veolia failed to exercise reasonable care when it discounted the possibility that problems unique to Flint's water supply were causing medical harms.

224.    Defendant Veolia failed to exercise reasonable care when it failed to warn about

34

the dangers of lead leaching into Flint's water system.

225. Defendant Veolia failed to exercise reasonable care when it did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

226. Plaintiffs suffered harm resulting from Defendant Veolia's failures to exercise reasonable care.

227. Defendant Veolia's failures to exercise reasonable care proximately caused the Plaintiffs' injuries and were entirely foreseeable.

228. Defendant Veolia is liable to Plaintiffs for all harms resulting to them from Defendant Veolia's failures to exercise reasonable care.

229. Defendant Veolia's liability includes, without limitation, lead poisoning, personal injuries, illnesses, and exposure to lead and other toxic substances suffered by Plaintiffs as a result of Defendant Veolia's failures to exercise reasonable care.

230. Defendant Veolia's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that it demonstrates a substantial lack of concern for whether an injury would result.

231. Defendant Veolia's actions and/or omissions were a proximate cause of the Plaintiffs' injuries. As a direct and proximate result, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning

capacity, as well as punitive and/or exemplary damages.

## COUNT IV – GROSS NEGLIGENCE
### Defendants Wurfel, Wells and Croft

232.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

233.    The individual MDEQ, MDHHS and Flint Defendants (collectively "Government Employee Defendants") independently owed Plaintiffs a duty to exercise reasonable care.

234.    The Government Employee Defendants undertook, for consideration, to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

235.    Based on their undertakings, the Government Employee Defendants had a duty to Plaintiffs to exercise reasonable care.

236.    Plaintiffs relied on the City, State, and/or Government Employee Defendants to perform the duty to ensure the proper treatment of Flint River Water.

237.    Plaintiffs relied on the City, State, and/or Government Employee Defendants to perform the duty to disclose known hazards in their drinking water.

238.    Defendants were grossly negligent.

239.    Defendants breached their duties to Plaintiffs in one or more of the following ways including but not limited to the following:

     a.  Failing to require corrosion control treatment of Flint River water;

     b.  Failing to conduct proper testing of Flint's water;

     c.  Failing to require proper testing of Flint's water;

     d.  Failing to respond to evidence that Flint's water was improperly treated;

     e.  Misrepresenting that corrosion control treatment had been implemented;

     f.  Publically declaring unsafe water to be safe to drink;

36

g. Ignoring evidence that Flint's water was unsafe to drink;

h. Withholding information that showed that Flint's water was unsafe to drink;

i. Publically discrediting those who claimed that Flint's water may not be safe to drink;

j. Failing to warn Plaintiffs or the public that Flint's water was not safe to drink.

240. Plaintiffs suffered harm resulting from the Government Employee Defendants' failures to exercise reasonable care.

241. The Government Employee Defendants' failures to exercise reasonable care proximately caused the Plaintiffs' injuries and were entirely foreseeable.

242. The Government Employee Defendants are liable to Plaintiffs for all harms resulting to them from the Government Employee Defendants' failures to exercise reasonable care.

243. The Government Employee Defendants' liability includes, without limitation, lead poisoning, personal injuries, illnesses, and exposure to lead and other toxic substances suffered by Plaintiffs as a result of the Government Employee Defendants' failures to exercise reasonable care.

244. The Government Employee Defendants' conduct and/or failure(s) to act constitute gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

245. The Government Employee Defendants' actions and/or omissions were a proximate cause of Plaintiffs' injuries. As a direct and proximate result, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other

37

organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity, as well as punitive and/or exemplary damages.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Defendants Wurfel, Wells and Croft

246.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

247.    The Government Employee Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.

248.    The Government Employee Defendants' outrageous conduct was intentional and/or reckless and made with a conscious disregard for the rights and safety of Plaintiffs.

249.    The Government Employee Defendants' outrageous conduct caused severe distress to Plaintiffs.

250.    The Government Employee Defendants' outrageous conduct was a proximate cause of Plaintiffs' injuries.

251.    As a direct and proximate result of the Government Employee Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity, as well as punitive

38

and/or exemplary damages.

## COUNT VI – BATTERY
### Defendants Wurfel, Wells and Croft

252.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

253.    The conduct of the Government Employee Defendants amounted to a battery because each Government Defendant, without the consent of Plaintiffs, put into motion a known harmful substance (untreated Flint River water) and it was substantially certain that Plaintiffs would be harmed in their person by exposure to said harmful substance.

254.    The Government Employee Defendants' conduct was a proximate cause of Plaintiffs' injuries.

255.    As a direct and proximate result of the Government Employee Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity, as well as punitive and/or exemplary damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for:

        A.     Compensatory damages;

        B.     Punitive damages;

        C.     Pre-judgment and post judgment interest;

        D.     Attorneys' fees and litigation expenses; and

E.      Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.


**ROBINSON, CARTER, CRAWFORD, PLLC**
Vinson F. Carter (P72659)
400 N. Saginaw Street, Suite 237
Flint, Michigan 48502
(810) 496-1025


**LEVY KONIGSBERG, LLP**
800 Third Avenue, 11th Floor
New York, New York 10022
(212) 605-6200


Dated: March 3, 2016.